FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

2011 JUN 17  PM 2: 43

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
                    DEPUTY

|                                   |     |                |
| --------------------------------- | --- | -------------- |
| NORTHPOINT TECHNOLOGY, LTD.,      | §   |                |
|                                   | §   |                |
| v.                                | §   | 09-CV-506-JRN  |
|                                   | §   |                |
| DIRECTV, INC., *et al.*           | §   |                |
|                                   | §   |                |
|                                   | §   |                |

## CLAIM CONSTRUCTION ORDER

### I.     INTRODUCTION

Before the Court in the above-entitled and styled cause of action are the pre-*Markman* Joint Claim Construction Statement (Clerk's Dkt. # 54); Northpoint's Opening Claim Construction Brief (Clerk's Dkt. # 58); Defendants' Opening Claim Construction Brief (Clerk's Dkt. # 62); Northpoint's Claim Construction Reply Brief (Clerk's Dkt. # 63); Defendants' Claim Construction Reply Brief (Clerk's Dkt. # 64); *Markman* Hearing Exhibits (Clerk's Dkt. # 141); *Markman* Hearing Transcript (Clerk's Dkt. # 148); Northpoint's post-*Markman* Claim Construction Brief (Clerk's Dkt. # 150); Defendants' post-*Markman* Claim Construction Brief (Clerk's Dkt. #151); post-*Markman* Joint Claim Construction Chart (Clerk's Dkt. # 152); Northpoint's post-*Markman* Responsive Claim Construction Brief (Clerk's Dkt. # 153); and Defendants' post-*Markman* Claim Construction Reply Brief (Clerk's Dkt. # 154).  The Special Master presided over the *Markman* hearing. All of the exhibits and oral argument from the hearing are in the record.  After thoroughly reviewing the record, the Court has determined that a separate Report and Recommendation from the Special Master is unnecessary.  Instead, the

Court, with the Special Master as a technical advisor, issues this final Claim Construction.[1]

## II.   BACKGROUND OF THE TECHNOLOGY

The object of the '636 Patent is to provide an apparatus and method for selecting and processing a desired data stream from numerous other data streams that are transmitted on one or more common carrier frequencies.

The abstract of the '636 Patent states:

> A multiple data stream processing arrangement includes a receiver/signal processor and a plurality of signal input paths which meet at a junction. A junction output from the junction provides a single input to the receiver/signal processor. A switching arrangement is associated with the plurality of signal input paths. The switching arrangement includes a switch connected in each signal input path. Each switch responds to an enable signal to allow a data stream applied to the respective input path to pass on the junction and to the receiver/signal processor. According to the invention only one signal input path and respective switch is enabled at any given time.

Claim 1 of the '636 Patent is reproduced below:

> An apparatus for receiving multiple data streams, the apparatus comprising:
>
> > (a) a first switch connected to a first input and having a first switch output, the first switch adapted to be selectively enabled for passing a first stream of data signals from the first input to the first switch output, the first stream of data signals including first channel data;
> >
> > (b) a second switch connected to a second input and having a second switch output, the second switch adapted to be selectively enabled for passing a second stream of data signals from the second input to the second switch output, the second stream of data signals including second channel data different from the first channel data;
> >
> > (c) a data stream junction connected to the first switch output and the second switch output and having a junction output;

---

[1] To be clear, because this claim construction is not a Report and Recommendation, but rather comes directly from the Court, it is final, and the parties will not have an opportunity to object.

(d) a controller for receiving a channel select input related to a desired channel output to be formed from one of the first channel data or second channel data, and, in response to the channel select input, for enabling the one of the first switch or the second switch which receives the stream of data including the channel data from which the desired channel output is to be formed; and

(e) a memory device operatively connected to the controller, the memory device storing first signal input information indicating the respective switch through which the first channel data is received and further storing second signal input information indicating the respective switch through which the second channel data is received.

## III.   GENERAL PRINCIPLES GOVERNING CLAIM CONSTRUCTION

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the Court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.* A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of

3

the patentee's invention. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This Court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (emphasis added) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id.* The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to and intended to be read by others skilled in the particular art. *Id.*

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of

ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id.* at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Id.* at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the

prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. *See id.* The *en banc* court condemned the suggestion made by *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *See Phillips*, 415 F.3d at 1319-24. The approach suggested by *Texas Digital*—the assignment of a limited role to the specification—was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id.* at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.* What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id.* The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id.* at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. *Id.* At 1319. In doing so, the court emphasized that claim construction issues are not resolved by any magic

6

formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id.* at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

## IV.   AGREED CONSTRUCTIONS

Based upon the joint submission of the parties' post-*Markman* claim construction charts, the following terms of the patent have been agreed to by the parties and are adopted by the Court:

| Claim Terms in '636 Patent | Agreed Construction |
|---|---|
| "plurality of different data streams" [claim 15] | "at least two different data streams" |
| "channel output" [claims 1, 8, 15, 16, 19] | "data which may be used as an input to a television, computer, or other device to produce a desired output from that device" |
| "channel data" [claims 1, 8, 15, 19] | "digital data used to produce a particular channel output" |
| "blocking" [claims 8, 15] | "preventing passage of a data stream" |
| "passing" [claim 1] | "permitting a data stream to proceed" |

| | |
|---|---|
| "input"<br><br>[claim 1] | "path on which a data stream travels" |
| "stream of data signals"<br><br>[claim 1] | "data stream" |

## V.    TERMS IN DISPUTE OF THE '636 PATENT

### 1.    "data stream[s]"

| Claim Term/Claim Language | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "data stream[s]"<br><br>[claims 1, 8, 15]<br><br>Context: Claim 1. "An apparatus for receiving multiple data streams, the apparatus comprising:" | "digital data transmissions on one or more carrier frequencies from a single source" | "digital data transmissions on one or more frequencies from a single source" |

The Court construes "data stream" as "digital data transmissions on one or more carrier frequencies from a single source."

**Analysis**

The Court adopts Northpoint's construction of "data stream" and thus adds the term "carrier" to the inventor's express definition of "data stream." The inventor includes the definition of "data stream" in the specification of the '636 Patent: "As used in this disclosure,

the term 'data stream' means digital data transmissions on one or more frequencies from a single source." '636 patent, 1:60-65.   This clear and express definition is generally controlling. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992).   But here, the Court adds the word "carrier" for two reasons: (1) it comports with the manner in which the term "data stream[s]" is used throughout the specification and the claims; and (2) it does not expand the scope of the term or the claims.   These reasons are explained below.

First, construing "data stream" to mean "digital data transmissions on one or more carrier frequencies from a single source" comports with the manner in which the term "data stream[s]" is used throughout the specification and the claims.   The '636 Patent uses "carrier frequencies" and "frequencies" interchangeably.   More specifically, the specification and the claims refer to "data," "signals," and "data streams" traveling on both "carrier frequencies" and "frequencies." *Compare* '636 Patent, 1:41-65; 6:19-22 (describing data streams and signals carried on *frequencies*), *with* '636, Patent 1:25-35, 37; 2:44-50; 3:9-14; 3:60-4:10; 4:65-5:4; claims 7, 14, 18 (describing signals and data streams carried on *carrier frequencies*).   Although "carrier frequencies" and "frequencies" are used interchangeably, the specification discusses "data streams" traveling on "carrier frequencies" *much* more often than "data streams" traveling on "frequencies." *See id.*   And more importantly, the actual claims discuss "data streams" in relation to "carrier frequencies" rather than just "frequencies." *See* claims 7, 14, 18.   For these reasons, Northpoint's construction, which adds the term "carrier" to the inventor's express definition, better fits with the claims and the specification than the defendants' construction. *See Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1351-55 (Fed. Cir. 2010) (accepting a district court's decision to add a term to an inventor's express definition in light of the claims,

9

specification, and prosecution history).

Second, adding the word "carrier" to the inventor's express definition does not narrow the scope of the term or the claims. *See Trading Techs. Int'l*, 595 F.3d at 1352 (noting that limitations from the specification generally should not be imported into the claims) (citations omitted). The defendants argue that including the word "carrier" will, in fact, import prohibited limitations into the claims. *See* Clerk's Dkt. # 151 at 5. But they provide no explanation for why that is the case. What is more, the defendants' argument is especially unavailing because the Court, *infra*, adopts the defendants' construction of "carrier frequency." The two terms are defined below:

a.  data streams: digital data transmissions on one or more carrier frequencies from a single source.
b.  carrier frequency: frequencies on which signals or data streams are carried.

In light of how the above definitions coalesce, the Court does not see how its construction of "data streams" will import any limitations into the claims. For these reasons, the Court adopts Northpoint's definition of "data stream."

### 2.  "source"

| Claim Term/Claim Language | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "source"<br><br>[this covers all claims including the term "data stream"]<br><br>Context: '636 Patent, 1:62-64. "digital data transmissions on one or more frequencies from a single source" | "satellite or terrestrial transmitter" | "plain and ordinary meaning, no construction needed"<br><br>or<br><br>"point of origin" |

The Court finds that "source" requires no construction.

**Analysis**

The term "source" can be anything. It should not be limited, as Northpoint suggests, to satellites and terrestrial transmitters. The plain language of the specification makes this clear. In fact, the specification states:

> The invention is *not limited* to signals received from a particular type of signal *source. For example*, one source may be a satellite while the other radio frequency signal source may be a terrestrial transmitter. Alternatively, both radio frequency signal sources may be satellites or both may be terrestrial transmitters.

'636 patent, 3:53-58 (emphasis added); *see also* 1:10-22. As the highlighted language indicates, sources are *not limited*; and satellites and transmitters are just *examples* of possible sources. Moreover, the '636 Patent is a method/apparatus for receiving and then processing data streams. The sources from which data streams are sent are simply beside the point. *See* '636 Patent, 1:20-23 (noting in the background of the invention that "[r]egardless of the source of the radio frequency signals which comprise the digital data stream, each data stream must be processed at the user location to provide useful information."). And finally, the merits of Northpoint's argument are as suspect as its timing. Northpoint made no effort to limit or even define the term "source" in its pre-*Markman* claim construction briefs. Rather, it was only after the defendants argued anticipation/obviousness that Northpoint sought to narrowly define "source" in order to avoid summary judgment. *See* Clerk's Dkt. #148 at 13:1-8. The Court is not convinced, and the scope of the '636 Patent will not be limited so that Northpoint can avoid prior art or prior publications. *See Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1384 (Fed. Cir. 2001). Accordingly, "source" will not be defined.

11

3.      "signals"

| Claim Term/Claim Language | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "signals" [claims 7, 14, 19] Context: Claim 7(a) "the first input receives signals on a plurality of first carrier frequencies" | Needs no construction | Same as "data stream" |

The Court construes "signals" to mean "digital data transmissions that together constitute a data stream."

**Analysis**

The Court does not adopt either of the proposed constructions for the term "signals." Neither Northpoint nor the defendants provide evidence to explain what the term "signals" means to a person of ordinary skill in the art. As a result, the Court refers to the specification. *Cf. Trading Techs. Int'l*, 595 F.3d at 1351-52 (noting that disputed terms should be given their meaning based on the perspective of a person of ordinary skill in the art at the time of filing, but also noting that claims must be read in view of the specification) (citations omitted). And the specification supports the Court's construction: "signals" are "digital data transmissions that together constitute a data stream." *See* '636 Patent, 1:20-34, 51-59; 1:65-2:10; 2:29-32; 2:65-3:5; 3:27-38; 3:61-4:10; 4:25-28; 6:19-22. Additionally, unlike the definition proposed by the defendants, the Court's construction of the term "signals" makes sense when grafted onto the disputed claims. *See* '636 Patent, claims 7, 14, 19; *Phillips*, 415 F.3d at 1316 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the

invention will be, in the end, the correct construction.") (citing *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).   For these reasons, the Court construes "signals" as "digital data transmissions that together constitute a data stream."

### 4.  "carrier frequency"

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "carrier frequency"<br><br>[claims 7, 18, 19]<br><br>Context: Claim 7(a) "the first input receives signals on a plurality of first carrier frequencies" | "frequency to which a receiver tunes in order to receive channel data in the data stream" | "frequencies on which signals or data streams are carried" |

The Court construes "carrier frequency" to mean "frequencies on which signals or data streams are carried."

### Analysis

Carrier frequencies carry signals and data streams.   This understanding of "carrier frequency" is found throughout the '636 Patent.   In fact, the Background of the Invention states that "[e]ach carrier frequency *carries* data from several different discrete outputs, which in the DBS example, comprise television channels."   '636 Patent, 1:30-32 (emphasis added). Additionally, the Preferred Embodiment explains how carrier frequencies carry "data," "signals," and "data streams".   *See* '636 Patent, 3:9-14; 3:61-4:9; 4:65-5:4.   Furthermore, the Court's construction of "data streams": "digital data transmissions on one or more carrier frequencies from a single source," comports with its construction of "carrier frequency": "frequencies on which signals or data streams are carried."   Ultimately, the specification teaches that carrier frequencies carry data streams.

13

Northpoint's attempt to add a tuning requirement to the term "carrier frequency" is redundant and incorrect. Carrier frequencies exist regardless of whether a device tunes to them. The Special Master's comment at the *Markman* hearing supports this understanding: radio waves broadcasted at carrier frequencies between 12.2 and 12.7 GHz are "penetrating [him] right now." *See* Clerk's Dkt. # 148, at 48:11. Although the record contains no expert testimony on this subject, the specification supports the Court's understanding of "carrier frequencies." For instance, the specification discusses carrier frequencies without any mention of a tuning requirement. *See* '636 Patent, 1:30-32. With all this said, the Court concedes that the apparatus described in the '636 Patent must tune to a specific carrier frequency so that the demodulation, demultiplexing, decoding, etc. can take place. *See* '636 Patent, 4:65-5:15. But how the underlying invention works does not change the nature of a "carrier frequency." And requiring that a tuning element be affixed to the lone term "carrier frequency" is unnecessary and redundant in light of both the specification and the claims. *See, e.g.*, '636 Patent, claim 19(a). In the end, "carrier frequency" is construed to mean "frequencies on which signals or data streams are carried."

5.      "common carrier frequenc[y]/frequenc[ies]"

| Claim Term/Claim Language | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "common carrier frequenc[y]/frequenc[ies]"<br><br>[claims 14, 18]<br><br>Context: Claim 14(a) "at least two of the data streams include signals on a common carrier frequency." | "a carrier frequency that at least two data streams have in common" | "frequencies that, if combined on a single path, could interfere with each other" |

The Court construes "common carrier frequency/frequencies" to mean "frequencies that, if combined on a single path, could interfere with each other."

**Analysis**

The Court adopts the defendants' construction of "common carrier frequency/frequencies" because it most naturally aligns with the claim language and comports with the specification. *See Phillips*, 415 F.3d at 1316 (citing *Renishaw* PLC, 158 F.3d at 1250). The specification discusses "common carrier frequencies" in several different contexts, but in each instance the term is described generally as: frequencies that could interfere with each other if combined on a single input path. *See* '636 Patent, 1:50-60; 3:65-4:10; 6:19-22. The specification's general description of "common carrier frequencies" is ideal because it is precise enough to clarify the meaning of the claims yet broad enough to avoid the danger of importing limitations into the claims. *See Trading Techs. Int'l*, 595 F.3d at 1351-52 (citations and quotations omitted). The defendants' proposed construction mirrors the specification's general explanation of "common carrier frequencies." Consequently, the Court adopts the defendants' construction of "common carrier frequency/frequencies."

15

6. "signal processing information"

| Claim Term/Claim Language | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "signal processing information" [claims 15, 16] Context: Claim 15(d) "storing channel output information for each different channel output which may be produced from the plurality of data streams, the channel output information for each respective channel output including signal processing information to control the signal processor in processing the respective channel data, and signal input information indicating the input path on which the respective channel data is carried." | "control information required by the tuner, demodulator, FEC decoder, and demultiplexer/format decoder in order to produce the desired channel output" | "information used by the signal processor" |

The Court construes "signal processing information" to mean "information used by the signal processor."

**Analysis**

The Court adopts a construction of "signal processing information" that does not risk limiting the scope of the claims. *See Trading Techs. Int'l*, 595 F.3d at 1352 (noting that courts should not limit broader claim language based on a preferred embodiment unless the inventor clearly expresses that intention) (citations and quotations omitted). Contrary to the Court's decision, Northpoint argues that their definition of "signal processing information" should be adopted because it comes straight from the inventor's lexicon. *See* Clerk's Dkt. # 58 at 6. This is wrong. The language cited by Northpoint is not the patentee's definition. *See* '636 Patent,

5:22-34. Instead, it is a description from the preferred embodiment. *See id.* That same preferred embodiment specifically states that it is not intended to limit the scope of the invention. *See* '636 Patent, 6:23-28. So, in accordance with the preferred embodiment's command, the Court does not apply to the rest of the invention the specific explanation of "signal processing information" found in the preferred embodiment. Rather, the Court construes "signal processing information" generally to mean "information used by the signal processor."

## VI. TERMS IN DISPUTE THAT NEED NO CONSTRUCTION

The following terms will not be construed: "first switch/second switch"; "switching structure"; "channel select input"; "input path". For each of these terms, Northpoint argues that no construction is necessary, while the defendants argue for various different constructions. *See* Clerk's Dkt. # 152. The Court agrees with Northpoint. The plain language of these terms is not ambiguous. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Furthermore, the defendants' proposed constructions do not change the terms' scope. *See id.* Finally, these terms will not confuse a jury. Therefore, no construction will take place.

## VII. CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the '636 Patent. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

It is so **ORDERED**.

09-CV-506-JRN

Signed this *17th* day of June, 2011.


_____
James R. Nowlin
United States District Judge